UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SHANE JONES o/b/o
MICHAEL T. JONES (deceased),

                Plaintiff,                   **DECISION AND ORDER**

        -against-                     19 Civ. 0418 (PED)

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.
-------------------------------------------------------X
**PAUL E. DAVISON, U.S.M.J.**


       On or about January 15, 2019, plaintiff Michael T. Jones ("Mr. Jones") commenced this

action pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of Social

Security (the "Commissioner") denying his application for benefits on the ground that he is not

disabled within the meaning of the Social Security Act (the "SSA"), 42 U.S.C. §§ 423 *et seq.*

Mr. Jones died on October 4, 2019.  On January 13, 2020, the parties consented to my

jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) (Dkt. #27).  On July 6, 2020, I

granted plaintiff's counsel's unopposed motion to substitute Shane Jones as plaintiff.  Dkt. #47.

       Presently before this Court are the parties' cross-motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. #32 (plaintiff's motion),

#33 (plaintiff's memorandum of law), #48 (defendant's cross-motion), #49 (defendant's

memorandum of law) and #52 (plaintiff's reply)).  Plaintiff argues, as the basis for his motion,

that the Administrative Law Judge ("ALJ"): (1) constructively reopened Mr. Jones's prior

application; (2) incorrectly assessed Mr. Jones's severe and non-severe impairments; (3)

incorrectly determined that Mr. Jones's impairments did not meet Listings 12.04, 12.06, 12.11

and 12.15; (4) failed to give controlling weight to the opinion of treating psychiatrist Dr. Al-Tariq; (5) erred in evaluating Mr. Jones's subjective allegations; (6) erred in evaluating Mr. Jones's Residual Functional Capacity ("RFC"); and (7) failed to demonstrate that there were a significant number of jobs in the national economy that Mr. Jones could perform. Dkt. #33, at 16-30. Defendant asserts, in response, that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. Dkt. #49, at 16-29. For the reasons set forth below, plaintiff's motion is **DENIED** and defendant's motion is **GRANTED**.

## I.  BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration, filed by defendant on January 7, 2020 (Dkt. #21).

A. Application History

On July 12, 2013, Mr. Jones filed his first application for disability insurance benefits, alleging that he had been disabled since July 3, 2013 due to bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), major depressive disorder and anxiety disorder. R. 10, 92, 97. That claim was administratively denied on October 2, 2013. R. 10, 92. Mr. Jones requested a hearing before an ALJ; a hearing was held on March 19, 2015 before ALJ Michael Rodriguez. Id. On August 5, 2015, the ALJ issued a written decision denying Mr. Jones's application. R. 92-102.

Mr. Jones filed the instant claim for disability insurance benefits on December 18, 2015, alleging that he had been disabled since August 6, 2015 due to major depression, anxiety disorder, bipolar disorder and ADHD. R. 107-08, 197. His claim was administratively denied on or about February 23, 2016. R. 124, 128. Mr. Jones requested a hearing before an ALJ; a hearing was held on October 18, 2017 before ALJ Laura Michalec Olszewski. R. 28-57, 136.

Mr. Jones appeared with counsel and testified at the hearing.  R. 28, 34-52.[1]  On January 29,

2018, the ALJ issued a written decision in which she concluded that Michael Jones was not

disabled within the meaning of the Social Security Act ("SSA").  R. 10-22.  The ALJ's decision

became the final order of the Commissioner on November 20, 2018, when the Appeals Council

denied plaintiff's request for review.  R. 1-6.  This action followed.

B.  Mental Health Treatment

On December 22, 2014, Mr. Jones underwent an initial assessment at the Sullivan County

Department of Community Services Division of Health and Family Services ("SCHFS").  R.

322-28.  He reported that he was on probation for assault and harassment (he assaulted his

brother, who was having an affair with Mr. Jones's wife).  R. 322.  Mr. Jones complained of

chronic depression and anxiety, unexplained mood swings and difficulty sleeping.  Id.  He stated

that his depression and anxiety started at the age of seven, when he found out his step-father

(who was also his paternal uncle) was sexually abusing his five-year-old sister.  Id.  Mental

status examination findings were as follows:

> The client appears stated age.  He is well oriented in all spheres.  Regarding level
> of consciousness, he appears calm.  Affect is appropriate.  Mood is depressed.  He
> presented himself in a neatly dressed and well-groomed fashion.  Eye contact can
> be described as poor.  His speech is minimal.  Recent memory appears mildly
> impaired.  Remote memory is mildly impaired.  Psychomotor activity can be
> characterized by normal movements and activity level.  There is a negligible
> degree of conceptual disorganization evident.  His thought content is
> characterized by no significant preoccupations.  Regarding perceptual
> functioning, the client denies hallucinations and none evident.  Attitude can be
> described as cooperative and interested.  As far as insight is concerned, the client
> verbalizes awareness of problems and sees consequences.  Judgment is fair.
> Attention/Concentration is characterized by distractibility.  Regarding impulse
> control the client acts without considering alternatives (sometimes).  Suicide
> Assessment: Current ideations–denied.  Lethality Assessment: None.  Homicidal

---

[1]  Vocational expert Christina Boardman also testified at the hearing.  R. 52-54.

Assessment: Current ideations–denied.

R. 323-24.  Mr. Jones's primary diagnosis was bipolar disorder.  R. 323.

On February 20, 2015, Mr. Jones was brought by ambulance to the Bon Secours Community Hospital emergency room.  R. 292.  He complained of increasing depression and anxiety with panic attacks for the past two weeks.  Mr. Jones reported that he was receiving mental health treatment from Dr. Al-Tariq [at SCHFS], who diagnosed bipolar depression, anxiety and ADHD.  R. 302.  Mr. Jones was compliant with his medications (Prozac, Adderall and Seroquel) and stated that they "are working."  R. 302, 329.  However, he felt like he had "bottomed out" and was seeking additional help; Dr. Gill authorized a voluntary admission.  Id. Upon mental status examination, Mr. Jones was alert, attentive, friendly, cooperative and had "some insight into his condition."  R. 303.  His affect was blunt and his speech was delayed; he was "slowed and withdrawn."  Id.  He was not agitated, aggressive, hyperactive, hallucinating or suicidal.  Id.  Mr. Jones was discharged five days later (February 25, 2015), with instructions to continue medications and mental health treatment.  R. 305.  According to the discharge notes:

> The patient started doing much better, sleeping better.  He was not showing as much anxiety as he was before and his psychomotor activity also improved. Energy level improved.  His affect is appropriate.  Mood euthymic.  Denies suicidal or homicidal thoughts.  No hallucinations or delusions elicited and memory intact.  Judgment and insight improved, . . . .

Id.

On May 21, 2015, SCHFS issued Mr. Jones's quarterly treatment plan.  R. 329-33. Mental status examination findings were as follows:

> The client appears stated age.  He is well oriented in all spheres.  Regarding level of consciousness, he appears calm.  Affect is flat.  Mood is depressed.  He presented himself in a neatly dressed and well-groomed fashion.  Eye contact can be described as good.  His speech is impoverished.  Recent memory appears normal.  Remote memory is mildly impaired.  Psychomotor activity can be

characterized by psychomotor retardation.  Regarding conceptual disorganization,
there is none evident.  His thought content is characterized by no significant
preoccupations.  Regarding perceptual functioning, the client denies
hallucinations and none evident.  Attitude can be described as open and
cooperative.  As far as insight is concerned, the client verbalizes awareness of
problems and sees consequences.  Judgment is intact (at this time).
Attention/Concentration is characterized by distractibility.  Regarding impulse
control the client acts without considering alternatives (sometimes).  Suicide
Assessment: Current ideations–denied.  Lethality Assessment: None.  Homicidal
Assessment: Current ideations–denied.

R. 332-33.

On August 13, 2015, Mr. Jones saw Dr. Quazi Al-Tariq at SCHFS.  R. 334-35.  Mr.

Jones's mental status examination findings were identical to those on May 21, 2015.  R. 334.

Dr. Al-Tariq noted:

Pt is making progress with meds.  Sleep and appetite are fair.  There is no
[hostility] and no depression.  He says he is not able to relax or focus without
Adderall.  Denies any plan to hurt self and others.  He is in good health.  There
[are] no side effects from the meds.  Plan continue all the meds.

Id.

On September 21, 2015, Dr. Al-Tariq noted no changes in Mr. Jones's mental status

examination.  R. 336.  According to Dr. Al-Tariq, Mr. Jones's activities of daily living ("ADLs")

were "fair" and he was anxious, but he was "feeling well on meds" and not experiencing any

side effects.  Id.

On October 27, 2015, Mr. Jones's mental status examination remained unchanged.  R.

338.  Dr. Al-Tariq noted that Mr. Jones was angry at his brother and that he "tend[ed] to believe

his wife drugged him while sleeping with his brother."  Id.  On November 10, 2015, the SCHFS

quarterly plan for Mr. Jones reflected no changes in his mental status examination findings.  R.

345-49.  The same mental status examination findings were again reported on December 1,

2015, at which time Dr. Al-Tariq noted that Mr. Jones was tense and having trouble sleeping, but

his insight and judgment were improving.  R. 340.

Mr. Jones's mental status examination findings remained unchanged through March 2016.  R. 365, 367, 369.  On January 7, 2016, Dr. Al-Tariq noted that Mr. Jones was making good progress with his medication (no mood swings, sleeping well, getting along well with others).  R. 365.  On February 11, 2016, Dr. Al-Tariq reported that Mr. Jones "gets upset easily" but was not acting out and was doing well on medications.  R. 367.  On March 9, 2016, Dr. Al-Tariq altered Mr. Jones's anxiety medication (substituting Buspar for Vistaril after Mr. Jones complained that Vistaril bothered him); Mr. Jones continued to take Prozac for depression, Adderall for ADHD and Seroquel to help him sleep.  R. 370.

On April 12, 2016, Dr. Al-Tariq noted several changes in Mr. Jones's mental status examination findings (which otherwise remained unchanged): his mood was depressed and anxious; his speech was logical and coherent; he exhibited normal psychomotor movements and activity level; he reported auditory and visual hallucinations; and his attention/concentration was "characterized by ability to attend and maintain focus."  R. 371.  Dr. Al-Tariq noted that Mr. Jones was "making progress with meds" and that his insight was improved.  Id.  On May 11, 2016 and June 14, 2016, Dr. Al-Tariq noted no additional changes to Mr. Jones's mental status examination findings, and stated that Mr. Jones was "stable on meds."  R. 373, 375.

On August 11, 2016, Dr. Al-Tariq reported that Mr. Jones was "doing well on meds" (without side effects), and noted a few changes to his mental status examination findings:

> The client appears stated age.  He is well oriented in all spheres.  Regarding level of consciousness, he appears alert.  Affect is appropriate.  Mood is euthymic.  He presented himself in an appropriate fashion.  Eye contact can be described as fair. His speech is animated.  Recent memory appears normal.  Remote memory is normal.  Psychomotor activity can be characterized by slowed reaction times. Regarding conceptual disorganization, there is none evident.  His thought content is characterized by no significant preoccupations.  Regarding perceptual

functioning, the client denies hallucinations and none evident.  Attitude can be
described as open and cooperative.  As far as insight is concerned, the client
verbalizes intact.  Judgment is intact.  Attention/Concentration is characterized by
ability to attend and maintain focus.  Regarding impulse control the client is
overly controlled and restrained.  Suicide Assessment: Current ideations–denied.
Lethality Assessment: None.  Homicidal Assessment: Current ideations–denied.

R. 377.  On September 13, 2016 and October 13, 2016, Dr. Al-Tariq noted no changes to Mr.

Jones's mental status examination findings, and stated that Mr. Jones was "doing well on meds."

R. 379, 381.[2]

On November 9, 2016, Mr. Jones began treatment with NP Diane Baynon at SCHFS.  R.

383.  She noted the following findings on mental status examination:

The client appears stated age but a little unkempt.  He is well oriented in all
spheres.  Regarding level of consciousness, he appears alert.  Affect is
appropriate.  Mood is depressed (on a scale of 1 to 10, #7).  He presented himself
in an appropriate fashion.  Eye contact can be described as fair.  His speech is soft
spoken, monotone.  Recent memory appears normal.  Remote memory is normal.
Psychomotor activity can be characterized by slowed reaction times.  Regarding
conceptual disorganization, there is none evident.  His thought content is
characterized by preoccupation with his thoughts whether his children are better
off with or without him.  Regarding perceptual functioning, the client denies
hallucinations and none evident.  Attitude can be described as open and
cooperative.  As far as insight is concerned, the client verbalizes intact.  Judgment
is intact.  Attention/Concentration is characterized by distractibility.  Regarding
impulse control the client is overly controlled and restrained.  Suicide
Assessment: Current ideations–denied.  Lethality Assessment: None.  Homicidal
Assessment: Current ideations–denied.

R. 385.  Mr. Jones requested a medication adjustment (Buspar made him nauseous and dizzy;

Seroquel made him feel too tired).  R. 383.  NP Banyon halved Mr. Jones's Seroquel dose and

substituted Vistaril for Buspar (with instructions to take it only if he has a panic attack or gets

agitated).  R. 384, 386.

On December 7, 2016, NP Banyon reported the following mental status examination

_____

[2]  October 13, 2016 is the last treatment note in the record from Dr. Al-Tariq.

findings:

> The client appears stated age. He is well oriented in all spheres. Regarding level of consciousness, he appears alert. Affect is stressed. Mood is anxious. He presented himself in an appropriate fashion. Eye contact can be described as fair. His speech is delayed. Recent memory appears mildly impaired. Remote memory is normal. Psychomotor activity can be characterized by slowed reaction times. There is a mild degree of conceptual disorganization evident. His thought content is characterized by preoccupation with his fears of blacking out and harming someone. Regarding perceptual functioning, the client denies hallucinations and none are evidenced. Attitude can be described as needy. As far as insight is concerned, the client verbalizes impaired–minimal. Judgment is fair. Attention/Concentration is characterized by distractibility. Regarding impulse control the client is overly controlled and restrained. Suicide Assessment: Current ideations–denied. Lethality Assessment: None. Homicidal Assessment: Current ideations–denied.

R. 388. Mr. Jones told NP Banyon that he stops all medication except for Adderall "for a couple of days when he has to go somewhere." R. 387. NP Banyon informed Mr. Jones "that is why he is depressed" and explained that he needed to consistently take his medication. Id. NP Banyon also prescribed Klonopin for Mr. Jones's anxiety "in the event he has a panic attack while out." Id.

On January 11, 2017, NP Banyon reported the following mental status examination findings:

> The client appears stated age. He is well oriented in all spheres. Regarding level of consciousness, he appears alert. Affect is flat. Mood is depressed and withdrawn. He presented himself in an appropriate fashion. Eye contact can be described as fair. His speech is minimal but spontaneous. Recent memory appears normal. Remote memory is normal. Psychomotor activity can be characterized by no energy. There is low self esteem, feels worthless[;] degree of conceptual disorganization evident. His thought content is characterized by focused on all the things he believes he can't do. Regarding perceptual functioning, the client denies hallucinations and none are evidenced. Attitude can be described as open and cooperative. As far as insight is concerned, the client verbalizes intact. Judgment is intact. Attention/Concentration is characterized by poor attention span. Regarding impulse control the client is overly controlled and restrained. Suicide Assessment: Current ideations–denied. Lethality Assessment: None. Homicidal Assessment: Current ideations–denied.

R. 388.

On February 3, 2017, Mr. Jones went to Bon Secours emergency room pursuant to a

referral from Adult Protective Services.  R. 357, 360.  Mr. Jones came from Orange Regional

Medical Center, where he initially went for detoxification.  R. 360.  His urine tested positive for

opiates and cocaine.  Id.  Mr. Jones reported that he became noncompliant with prescribed

medication for one month due to lapse of his Medicaid card.  Id.  He was admitted to Bon

Secours, "where he continued to be more withdrawn, isolated, depressed and was having

difficulty forming cognitive sentences, which were goal directed."  Id.  After his medications

were adjusted, Mr. Jones:

> started to do pretty well and began to show animation and more motivation.  He
> became more focused, interested in his future and felt having support and
> confidence that he can solve this conditions [sic] and was expressing thoughts of
> seeing his children.  He gave up suicidal ideations and tolerated the medications
> fairly well.

R. 360-61.  He was discharged on February 13, 2017; mental status examination findings upon

discharge noted:

> [The patient was alert, oriented, cooperative[,] focused, goal directed and had a
> positive happy mood and an animated affect.  He was not having any suicidal or
> any homicidal ideations.  He was not expressing any auditory or visual
> hallucinations.  His memory was intact.  Insight and judgment appeared to be
> more rational and fair at this time.

R. 361.

On February 15, 2017, NP Banyon reported the following mental status examination

findings:

> The client appears stated age.  He is well oriented in all spheres.  Regarding level
> of consciousness, he appears agitated.  Affect is stressed, fearful.  Mood is very
> anxious.  He presented himself in an appropriate fashion.  Eye contact can be
> described as fair.  His speech is delayed.  Recent memory appears mildly
> impaired.  Remote memory is normal.  Psychomotor activity can be characterized

by slow reaction times.  There is a mild degree of conceptual disorganization evident.  His thought content is characterized by my mind is all over the place.  Regarding perceptual functioning, the client denies hallucinations and none are evidenced.  Attitude can be described as needy.  As far as insight is concerned, the client verbalizes impaired–minimal.  Judgment is fair.  Attention/Concentration is characterized by distractibility.  Regarding impulse control the client is overly controlled and restrained.  Suicide Assessment: Current ideations–active.  Lethality Assessment: None.  Homicidal Assessment: Current ideations–denied.

R. 388.  NP Banyon adjusted Mr. Jones's medications consistent with the adjustments made at Bon Secours (discontinued Prozac and Klonopin, continued Seroquel (sleep) and Vistaril (anxiety) and prescribed Cymbalta and Trazadone (depression)).  R. 394-95.

On February 16, 2017, Dr. Al-Tariq completed an employability assessment for the New York State Office of Temporary and Disability Assistance.  R. 415-16.  He listed Mr. Jones's diagnoses as bipolar disorder and PTSD [post-traumatic stress disorder], and stated:  "Michael experience[s] severe PTSD symptoms that are disabling, including debilitating anxiety and panic, agoraphobia, trauma-induced hallucinations, flashbacks, suicidal ideation [and] depression."  R. 415.  Dr. Al-Tariq indicated (by checking boxes on the form) that Mr. Jones's mental functioning was limited as follows:  "moderately limited" in making simple decisions; "very limited" in understanding, remembering and carrying out instructions, "very limited" in maintaining attention and concentration; "very limited" in maintaining basic standards of personal hygiene and grooming; "severely limited" in interacting appropriately with others; "severely limited" in maintaining socially appropriate behavior without exhibiting behavior extremes; and "severely limited" in his ability to function in a work setting at a consistent pace.  R. 416.[3]  Dr. Al-Tariq opined that Mr. Jones was "absolutely unable to work in <u>ANY</u>

---

[3]  The form does not define the terms "moderately limited," "very limited" or "severely limited."  R. 415-16.

environment at this time and for at least 12 mos. due to extreme PTSD symptoms." <u>Id.</u>

(emphasis in original).[4]

On March 17, 2017, Mr. Jones's medication was changed by Dr. Salgunan at SCDHF

(increased Trazadone and prescribed Neurontin (for pain and anxiety). R. 399.

On March 22, 2017, Mr. Jones complained to NP Banyon that he was having nightmares

and was depressed (level was 8/10). R. 401. NP Banyon reported the following mental status

examination findings:

> The client appears stated age. He is well oriented in all spheres. Regarding level
> of consciousness, he appears more mellow this evening. Affect is less strained
> and coping. Mood is depression #8. He presented himself in an appropriate
> fashion. Eye contact can be described as fair. His speech is spontaneous. Recent
> memory appears mildly impaired. Remote memory is normal. Psychomotor
> activity can be characterized by slowed reaction times. There is a mild degree of
> conceptual disorganization evident. His thought content is characterized by "I
> feel beat up. I crashed for 2 days this week and sometimes I am up 4 days a
> week." Regarding perceptual functioning, the client denies hallucinations and
> none are evidenced. Attitude can be described as needy. As far as insight is
> concerned, the client verbalizes impaired–minimal. Judgment is fair.
> Attention/Concentration is characterized by distractibility. Regarding impulse
> control the client is overly controlled and restrained. Suicide Assessment:
> Current ideations–active. Lethality Assessment: None. Homicidal Assessment:
> Current ideations–denied.

<u>Id.</u> NP Banyon adjusted Mr. Jones's medications (discontinued Seroquel and Cymbalta,

decreased Trazadone (due to nightmares), continued Vistaril and Neurontin and added Prozac

(depression)). R. 402-03.

On April 12, 2017, NP Banyon noted one change in Mr. Jones's mental status

examination findings (which otherwise remained unchanged): his thought content was

---

[4] Dr. Al-Tariq indicated that he last examined Mr. Jones on February 16, 2017. R. 416.
However, as discussed above, the last treatment note in the record from Dr. Al-Tariq is dated
October 13, 2016.

characterized as "focused on feeling better." R. 404. On May 17, 2017, NP Banyon noted additional changes in Mr. Jones's mental status examination findings (which otherwise remained unchanged): his level of consciousness was alert; his mood was less ambivalent, neutral, content and coping; his psychomotor activity was within normal limits; his thought content was characterized as focused on his responsibilities and staying out of trouble; and his attitude was described as positive. R. 406. On July 5, 2017, NP Banyon noted further changes in Mr. Jones's mental status examination findings (which otherwise remained unchanged): his level of consciousness was irritable; his affect was stressed; his mood was depressed (8/10); his psychomotor activity was characterized by slowed reaction times due to back pain; his thought content was characterized by "I am sleeping all the time" and when he is not, he ruminates about his losses; and his attitude was described as "needy and non-compliant with treatment by offering many excuses and rationalizing." R. 409-10. NP Banyon adjusted Mr. Jones's medications (discontinued Vistaril and Trazadone, continued Neurontin and Prozac and added Abilfy (irritability)). R. 409-11.

On August 23, 2017, Mr. Jones reported to NP Banyon that he was "doing well on his present medication." R. 412. NP Banyon noted the following changes in Mr. Jones's mental status examination findings (which otherwise remained unchanged): his level of consciousness was alert; his affect was calm; his mood was depressed (7/10); his psychomotor activity was characterized by psychomotor retardation; his thought content was characterized as focused on his responsibilities and staying out of trouble; his attitude was positive and he stated he was less angry; and his attention/concentration was characterized as an ability to attend and maintain

focus.  R. 412-13.[5]

C.  <u>Michael Jones's Hearing Testimony</u>

Michael Jones was 48 years old at the time of the hearing.  R. 34.  He finished 8th grade

and eventually got his GED.  R. 34-35.  He was divorced, with four children (ages 23, 23, 19 and

13).  R. 35.  He was in contact with his children, but not as much as he used to be.  <u>Id.</u>  He lived

with his aunt and her boyfriend, in a trailer owned by his aunt.  R. 35-36.  Mr. Jones was not

working and was receiving public assistance.  R. 36.  He possessed a driver's license but did not

drive.  <u>Id.</u>  He did not have access to public transportation; his aunt, his caseworker, his son or

Mobile Medic drove him to places he needed to go.  R. 36-37, 45.

Mr. Jones worked as a laborer for Bett and Creedon for fourteen years, until he quit in

2014.  R. 37-38.  According to Mr. Jones, he had been having problems on the job (" a little

behind" and "referred to as retard") and had "put up with it" for a long time but "was having bad

thoughts" (homicidal, suicidal) so he left.  R. 38.  He had a criminal history (convictions for

"stolen property and assault and several things"); his last conviction was about five or six years

earlier.  R. 38-39.  He had stopped drinking alcohol seven or eight years prior to the hearing.  R.

40.

Mr. Jones testified that he typically spent his day watching television, which he turned on

───────────────

[5]  The record also contains SCDHF treatment notes from September and October 2017.
R. 75-82.  However, the ALJ declined to admit those records into evidence (as well as an
undated, unsigned medical source statement from LCSW Denman (R. 84-87)), because plaintiff
failed to demonstrate good cause for missing the deadline for their submission.  R.10, 31-33.
<u>See</u> 20 C.F.R. §404.935(a).  Plaintiff relies on the excluded evidence in support of the instant
motion, without mentioning the ALJ's exclusion and absent a proffer of any basis to overturn the
ALJ's determination.  Accordingly, I decline to consider the SCDHF treatment notes from
September and October 2017, and LCSW Denman's medical source statement.  <u>See</u> <u>Bauza v.
Comm'r of Soc. Sec.</u>, 18 Civ. 1434, 2020 WL 4462512, at *5-6 (W.D.N.Y. Aug. 4, 2020).

"just for sound" in order "to keep the voices down."  R. 41.  He often heard the voice of his

cousin Ralph (who died the year before).  Id.  Mr. Jones also heard voices "in the mirror" which

told him "to do stupid stuff" and asked him why he kept letting people disrespect him.  R. 41-42.

His medication helped "a little bit."  R. 47.  He kept a bag packed with clothes and slippers

because he always thought someone was coming to take him "to mental health."  R. 42.  He did

not help with household chores.  R. 42-43.  He could make himself food, if he had something he

could throw in the microwave.  R. 43.  He did not leave the house unless "somebody pretty much

drags [him] out to get food or something."  R. 44.  Mr. Jones attended therapy twice a month.  Id.

He had no hobbies; he had difficulties with concentration and focus.  R. 44-45.

       Mr. Jones had a caseworker assigned to him by social services.  R. 48.  The caseworker

did all of Mr. Jones's social service paperwork, visited his home three or four times each month

to make sure he was properly taking his medication, drove him to doctors (or arranged for other

transportation) and took him shopping.  R. 48-49.

D.  Consultative Psychiatric Evaluation

       On February 12, 2015, psychiatrist Melissa Antiaris conducted a consultative

examination of Mr. Jones.  R. 351-54.  Dr. Antiaris noted that Mr. Jones was divorced, lived

alone in Sullivan County and was driven to the appointment by his aunt.  R. 351.  Mr. Jones

reported that he dresses himself everyday, bathes twice a week and is able to clean, complete

laundry and microwave meals.  R. 353.  He stated that he goes shopping with his aunt and can

manage his funds.  Id.  He reported that he drives "only in a limited fashion" and does not take

public transportation.  Id.  Mr. Jones stated that he had no hobbies, and spent his days looking

out the window and sleeping.  Id.

       Mr. Jones reported that he had been feeling depressed for "a long time" and was "feeling

-14-

worse every day." R. 351. He complained of sleep difficulties and loss of appetite (and stated he had lost forty pounds). Id. He stated that he does not leave the house and cannot be out alone. Id. Mr. Jones reported worthlessness, diminished self esteem, social withdrawal, dysphoric mood and hopelessness. Id. He also reported that he has been "in trouble before" and is afraid to be out because he might hurt someone. R. 351-52. He stated that he has intolerance for people, but is okay with his family; he denied any current or recent desire to harm himself or anyone else. R. 352. Mr. Jones stated that his problems stem from two incidents in 2012: his wife cheated on him with his brother; and his mother died of cancer. Id. He reported that he is "very nervous in crowds" and suffers panic attacks when he leaves the house. Id. He denied any mania or thought disorder symptoms. Id. Mr. Jones complained of difficulty with short-term memory, concentration and focus. Id.

Mr. Jones was cooperative during the mental status exam, and he related adequately. R. 352. Dr. Antiaris noted that Mr. Jones was disheveled and poorly groomed. Id. His eye contact was appropriate and his posture was normal. Id. Mr. Jones's motor behavior was restless. Id. His speech was fluent and clear; his expressive language was adequate but his receptive language was poorly developed. Id. According to Dr. Antiaris, Mr. Jones's thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia" and he was oriented to person, place, and time. R. 352-53. Mr. Jones's affect was depressed and his mood was apathetic. R. 353. Dr. Antiaris noted that Mr. Jones's attention and concentration were mildly impaired due to concentration difficulties, and that he was able to count and perform simple calculations but had difficulty with serial 3's. Id. The doctor also noted that Mr. Jones's recent and remote memory skills were mildly impaired due to limited intellectual functioning, that he was able to recall 3/3 objects immediately and 2/3 after delay, and that he could recall

five digits forward but none backward.  Id.  Dr. Antiaris estimated that Mr. Jones's cognitive

functioning was "in the borderline range."  Id.  The doctor also noted that Mr. Jones's general

fund of information was appropriate to experience, that his insight was fair and that his judgment

was poor.  Id.

> Dr. Antiaris evaluated Mr. Jones's functional abilities as follows:
>
> There are no limitations in the claimant's ability to follow and understand simple
> directions and instructions or perform simple tasks.  He is mildly limited in his
> ability to maintain attention and concentration or a regular schedule.  He is
> moderately limited in his ability to learn new tasks or perform complex tasks
> independently.  He does require supervision.  He is moderately limited in his
> ability to make appropriate decisions and relate adequately with others.  He is
> markedly limited in his ability to appropriately deal with stress.  Difficulties are
> caused by lack of motivation.

R. 353-54.  Dr. Antiaris opined that Mr. Jones's limitations "appear to be consistent with

psychiatric concerns which may significantly interfere with the claimant's ability to function on

a daily basis."  R. 354.  Dr. Antiaris diagnosed major depressive disorder (moderate),

unspecified anxiety disorder and agoraphobia.  Id.  She assessed Mr. Jones's prognosis as

"guarded" and recommended that he continue with his current psychological/psychiatric

treatment.  Id.

## II.  LEGAL STANDARDS

A.  Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the

decision of the Commissioner of Social Security, with or without remanding the cause for a

rehearing."  42 U.S.C. § 405(g).  See 42 U.S.C. § 1383(c)(3).  "It is not the function of a

reviewing court to decide *de novo* whether a claimant was disabled."  Melville v. Apfel, 198

F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'"  Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard."  Brault v. Soc. Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the Commissioner's factual findings and the inferences drawn from those facts, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence.  See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."  McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).

"However, where the proper legal standards have not been applied and 'might have affected the disposition of the case, the court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is grounds for reversal.'"  Velez v. Colvin, No. 14 Civ. 3084, 2017 WL 1831103, at *15 (S.D.N.Y. June 5, 2017) (citing Pollard v. Halter,

377 F.3d 183, 189 (2d Cir. 2004)).  Thus, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in relation to the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted.  Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.  Statutory Disability

A claimant is disabled under the Social Security Act ("the SSA") when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).[6]  In addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

Social Security Regulations set forth a five-step sequential analysis for evaluating whether a person is disabled under the SSA:

(1) whether the claimant is currently engaged in substantial gainful activity;

(2) whether the claimant has a severe impairment or combination of impairments;

(3) whether the impairment meets or equals the severity of the specified

---

[6]  In the event that the regulations and Social Security Rulings cited herein were amended subsequent to the ALJ's decision, I discuss (and have applied) the relevant regulations/rulings as they existed at the time of the ALJ's decision.

impairments in the Listing of Impairments;

(4) based on a "residual functional capacity" assessment, whether the claimant

can perform any of his or her past relevant work despite the impairment; and

(5) whether there are significant numbers of jobs in the national economy that the

claimant can perform given the claimant's residual functional capacity, age,

education, and work experience.

McIntyre, 758 F.3d at 150 (citing 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v)).  The

claimant bears the burden of proof as to the first four steps of the process.  See Burgess v.

Astrue, 537 F.3d 117, 120 (2d Cir. 2008).  If the claimant proves that his impairment prevents

him from performing his past work, the burden shifts to the Commissioner at the fifth and final

step.  See Brault, 683 F.3d at 445.

Additionally, where a claimant suffers from an alleged mental impairment, the ALJ is

required to utilize a "special technique" at the second and third steps.  See Kohler v. Astrue, 546

F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §§ 404.1520a, 416.920a.  At step two, in

determining whether the claimant has a "severe impairment," the ALJ must rate the claimant's

degree of functional limitation in four areas: (1) understanding, remembering, or applying

information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and

(4) adapting or managing oneself.  See 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  If the

claimant's mental impairment or combination of impairments is severe, then at step three the

ALJ must "compare the relevant medical findings and the functional limitation ratings to the

criteria of listed mental disorders in order to determine whether the impairment meets or is

equivalent in severity to any listed mental disorder."  Kohler, 546 F.3d at 266 (citing 20 C.F.R. §

404.1520a(d)(2)).  See also 20 C.F.R. § 416.920a(d)(2).  If the claimant suffers from a severe

-19-

impairment which is not listed (or equivalent in severity to a listed mental disorder), then the

ALJ must assess the claimant's residual functional capacity.  See Kohler, 546 F.3d at 266 (citing

§ 404.1520a(d)(3)).  See also 20 C.F.R. § 416.920a(d)(3).

### III.  THE ALJ'S DECISION

To assess Mr. Jones's disability claim, the ALJ followed the five-step sequential analysis

and applied the "special technique" at steps two and three.  See  20 C.F.R. §§ 404.1520(a)(4)(I)-

(v), 404.1520a and discussion, *supra*.  At step one, the ALJ concluded that Mr. Jones had not

engaged in substantial gainful activity since August 6, 2015 (the alleged onset date).  R. 13.  At

step two, the ALJ concluded that Mr. Jones had the following severe impairments: major

depressive disorder; bipolar disorder; generalized anxiety disorder; PTSD; and substance abuse

disorder.  Id.  The ALJ also noted:

> By contrast, there is insufficient evidence in the medical record that the
> claimant's history of back pain, changes of ulna and ossific density within the soft
> tissues to the humerus and history of attention deficit hyperactivity disorder
> (ADHD) or attention deficit disorder (ADD) have more than a *de minimis* effect
> on his ability to perform physical or work activities. . . . Because there is no
> evidence that such impairments caused more than a minimal limitation in the
> claimant's ability to perform basic work activities for 12 consecutive months,
> they are therefore nonsevere . . . .

Id. (italics in original).

At step three, the ALJ determined that Mr. Jones's impairments (individually or

combined) did not meet or medically equal the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1.  R. 14-15.  Specifically, the ALJ found that Mr. Jones's

mental impairments, considered singly and in combination, did not meet or medically equal the

criteria of listings 12.04, 12.06, 12.11 or 12.15.  R. 14.[7]  In making this finding, the ALJ first

considered whether the  "paragraph B" criteria are satisfied.  Id.  "To satisfy the 'paragraph B'

criteria, the mental impairment must result in at least one extreme or two marked limitations in a

broad area of functioning which are: understanding, remembering, or applying information;

interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing

themselves."  Id.  The ALJ found that Mr. Jones had moderate limitations in all four areas of

functioning.  R. 14-15.  Thus, the ALJ concluded that the "paragraph B" criteria were not

satisfied.  R. 15.  The ALJ also considered whether the "paragraph C" criteria were satisfied, and

concluded that the record evidence failed to establish the presence of the "paragraph C" criteria.

Id.  Finally, the ALJ noted that the limitations identified in the paragraph B criteria are used to

rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process,

whereas the mental RFC assessment used at steps 4 and 5 "requires a more detailed assessment."

Id.  Accordingly, the ALJ noted that his RFC assessment "reflects the degree of limitation [I

have] found in the 'paragraph B' mental functional analysis."  Id.

> Next, the ALJ assessed Mr. Jones's RFC as follows:
>
> After careful consideration of the entire record, [I find] that the claimant has the
> residual functional capacity to perform a full range of work at all exertional
> levels, but with the following nonexertional limitations: the claimant should work
> in a low stress environment defined as occasional judgment, occasional decision-
> making, and occasional changes in work setting.  He should be limited to simple,
> routine, and repetitive tasks.  The claimant should have occasional interaction
> with supervisors, co-workers and the public.

---

[7]  Listing 12.04 is the listing for "depressive, bipolar and related disorders."  See 20
C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  Listing 12.06 is the listing for "anxiety and obsessive-
compulsive disorders."  See id., § 12.06.  Listing 12.11 is the listing for "neurodevelopmental
disorders."  See id., § 12.11.  Listing 12.15 is the listing for "trauma- and stressor-related
disorders."  See id., § 12.15.

R. 15-16.  In reaching this conclusion, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and "opinion evidence" in accordance with 20 C.F.R. §§ 404.1527, 404.1529 and the Social Security Ruling 16-3p.  R. 16.

At step four, the ALJ determined that Mr. Jones was unable to perform any past relevant work.  R. 20.  At step five, based upon the vocational expert's testimony, the ALJ concluded that Mr. Jones was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  R. 21-22.  Thus, the ALJ found Mr, Jones "not disabled" as defined in the SSA.  R. 22.

## IV.  DISCUSSION

### A.  Constructive Reopening

As noted above, Mr. Jones's prior application for disability benefits was denied on August 5, 2015.  R. 92-102.  He filed a second application on December 18, 2015, alleging that he had been disabled since August 6, 2015.  R. 107-08, 197.  On January 29, 2018, ALJ Olszewski denied Mr. Jones's second application for benefits.  R. 10-22.  This action followed.

Mr. Jones argues that, in ruling on the second application, the ALJ constructively reopened the prior application because "the Commissioner furnished the medical records in the prior case as part of the record evidence in the subsequent application."  Dkt. #33, at 30.[8]  "A constructive reopening occurs when the ALJ 'reviews the entire record and renders a decision on the merits,' in which case 'any claim of administrative res judicata' is deemed 'to have been waived and thus, the claim is . . . subject to judicial review.'"  Id. (citations and quotation marks

---

[8]  Citations to specific pages following "Dkt. #___" refer to ECF pagination.

omitted).  D'Amato v. Comm'r of Soc. Sec., No. 18 Civ. 6998, 2020 WL 759957, at *16 (S.D.N.Y. Jan. 30, 2020) (quoting Byam v. Barnhart, 336 F.3d 172, 180 (2d Cir. 2003), *report and recommendation adopted,* 2020 WL 757841 (S.D.N.Y. Feb. 14, 2020).  However, "[a] prior disability application is not 'constructively reopened' when the ALJ merely discusses prior proceedings and evidence to describe a claimant's background."  Benner v. Comm'r of Soc. Sec., No. 18 Civ. 6679, 2020 WL 6548539, at *4 (W.D.N.Y. Nov. 6, 2020) (quotation marks, alteration and citation omitted).

Here, the ALJ mentioned Mr. Jones's prior application only "[b]y way of background." R. 10.  Additionally, although the ALJ considered evidence from the prior period (R. 292-309, 322-333), those records were relevant to the period at issue in this case: August 6, 2015 (the alleged onset date) through January 29, 2018 (the date of the ALJ's decision).  See 20 C.F.R. § 404.1512(b) ("we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . .").  More to the point, the ALJ did not consider the *entire* prior record or render a decision on the merits of the prior claim.  R. 10-22.  Accordingly, the ALJ did not constructively reopen Mr. Jones's prior application.  See Pataro v. Berryhill, No. 17 Civ. 6165, 2019 WL 1244664, at *14 (S.D.N.Y. Mar. 1, 2019) ("[The ALJ did not 'constructively reopen' plaintiff's first application merely by mentioning it before rendering a decision on the merits of her second application."), *report and recommendation adopted*, 2019 WL 1244325 (S.D.N.Y. Mar. 18, 2019); Hussain v. Comm'r of Soc. Sec., 13 Civ. 3691, 2014 WL 4230585, at *12 (S.D.N.Y. Aug. 27, 2014) (no constructive reopening "where there was good reason to examine the medical evidence from the prior period to adjudicate the second application and where the ALJ explicitly recognized that his findings addressed only the second application"), *report and recommendation adopted*, 2014 WL 5089583 (S.D.N.Y. Sept.

25, 2014).

B. Severe and Non-Severe Impairments

The second step of the sequential analysis is intended to "screen out the very weakest cases." McIntyre, 758 F.3d at 151.  An ALJ must determine whether an impairment is "severe" or merely de minimis.  Id.  An impairment is not severe unless it is expected to result in death, or it has prevented (or can be expected to prevent) a claimant from working for a continuous twelve-month period.  42 U.S.C.§ 423(d)(l)(A); see Barnhart v. Walton, 535 US. 212, 222 (2002) (affirming the Commissioner's interpretation of 42 U.S.C. § 423(d)(l)(A) that the expected period of inability to work, not just the impairment itself, must last for twelve consecutive months).  Thus, an ALJ may decide that an impairment is not severe "if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Mezzacappa v. Astrue, 749 F. Supp.2d 192, 205 (S.D.N.Y. 2019).

Plaintiff argues that the ALJ erred at step two because she failed to include PTSD as a severe impairment, and "ignored" x-ray evidence of "hypertrophic changes, and an ossific density in the soft tissues near the humerus." Dkt. #33, at 25.  Plaintiff's arguments are unavailing.  First, the ALJ clearly listed PTSD as a "severe impairment."  R. 13.  Second, the record indicates that Mr. Jones sought treatment for a right wrist complaint only once, in December 2016.  R. 355-56.  An x-ray revealed no acute fracture and a possible old fracture.  R. 356.  The ALJ specifically noted that the x-ray of Mr. Jones's forearm showed "changes of ulna and ossific density within the soft tissues to [sic] the humerus" but "no acute fracture was identified."  Id.  Indeed, in January 2016, Mr. Jones reported "no real physical limitations" and, in February 2017, Dr. Al-Tariq indicated that Mr. Jones had no physical functioning limitations.

-24-

R. 240, 416.  As the ALJ found, there is no evidence that the conditions revealed by the x-ray "ha[d] more than a *de minimis* effect on [Mr. Jones's] ability to perform physical or work activities."  R. 13 (emphasis in original).  Accordingly, plaintiff fails to demonstrate that the ALJ erred at step two.

## C.  The Listings

Plaintiff contends that the ALJ incorrectly determined that Mr. Jones's impairments did not meet Listings 12.04, 12.06, 12.11 and 12.15.  Dkt. #33, at 23-26.  "It is the plaintiff's burden to establish that [Mr. Jones's] medical condition or conditions meet all of the specific medical criteria of the particular listed impairments."  Frederick C. v. Comm'r of Soc. Sec., No. 19 Civ. 1078, 2021 WL 466813, at *5 (N.D.N.Y. Feb. 9, 2021).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990); see 20 C.F.R. § 404.1525(c)(3) ("We will find that your impairment(s) meet the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement . . . .").

Listing 12.11 has "two paragraphs, designated A and B"; a mental impairment meets that listing if it satisfies the requirements of both paragraphs.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(A)(2).  Listings 12.04, 12.06, and 12.15 "have three paragraphs, designated A, B, and C; those listings are met if a mental impairment satisfies "both paragraphs A and B, or the requirements of both paragraphs A and C."  Id.

### 1.  "Paragraph B" criteria

The "Paragraph B" criteria in Listings 12.04, 12.06, 12.11 and 12.15 will be satisfied if a claimant demonstrates:

Extreme limitation of one, or marked limitation of two, of the following areas of
mental functioning (see 12.00F):
    1. Understand, remember, or apply information (see 12.00E1).
    2. Interact with others (see 12.00E2).
    3. Concentrate, persist, or maintain pace (see 12.00E3).
    4. Adapt or manage oneself (see 12.00E4).

Id., §§ 12.04, 12.06, 12.11, 12.15.  Here, the ALJ determined that the "Paragraph B" criteria

were not satisfied because Mr. Jones's had moderate limitations in all four areas of functioning.

R. 14-15.

    *First*, substantial evidence supports the ALJ's determination that Mr. Jones had a

moderate limitation with regard to understanding, remembering or applying information.  As

discussed in detail above, treatment notes reflect mild, intermittent problems with recent and

remote memory, minimally-impaired insight and fair judgment (which was generally intact until

his hospitalization in February 2017).  Additionally, consultative psychiatrist Dr. Antiaris opined

that Mr. Jones had no limitations with regard to following and understanding simple instructions

and performing simple tasks, and moderate limitations with regard to learning new tasks,

performing complex tasks independently (with supervision) and making appropriate decisions.

    *Second*, substantial evidence supports the ALJ's determination that Mr. Jones was

moderately limited in his ability to interact with others.  Mr. Jones testified that he lived with his

aunt and her boyfriend and that he was in contact with his children (although not as much as he

used to be).  He testified that his aunt and his son drove him to places he needed to go.  He also

testified that his caseworker visited him three or four times a month, drove him to doctor

appointments and took him shopping.  Additionally, treatment notes reflect that Mr. Jones was

consistently open and cooperative; he was similarly cooperative (and related adequately) during

his consultative psychiatric examination.  Further, the ALJ's determination is consistent with Dr.

Antiaris's opinion that Mr. Jones was moderately limited in his ability to relate adequately with others.

*Third*, substantial evidence supports the ALJ's determination that Mr. Jones had a moderate limitation in his ability to concentrate, persist or maintain pace.  Treatment notes indicate that Mr, Jones was often distracted, although he was able, at times, to attend and maintain focus.  Further, although Mr. Jones testified to hearing voices, treatment notes generally reflect no audio or visual hallucinations.  Finally, Dr. Antiaris opined that Mr. Jones was mildly limited in ability to maintain attention, concentration and a regular schedule.

*Fourth*, in determining that Mr. Jones's ability to adapt and manage himself was moderately limited, the ALJ noted: stress caused Mr. Jones to panic; he had taken oxycodone and used cocaine in February 2017; and he had contemplated ways to hurt himself.  R. 15.  The ALJ also noted that Dr. Al-Tariq opined that Mr. Jones was severely limited in the ability to maintain personal hygiene and grooming.  Id.[9]  The ALJ's assessment of a "moderate" limitation is puzzling: she discusses evidence which seems to undermine Mr. Jones's ability to adapt and manage himself, but does not point to any evidence supporting his ability to adapt and manage to any degree.  I note that Dr. Al-Tariq's assessment (that Mr. Jones was very limited in the ability to maintain personal hygiene and grooming) is contradicted by the treatment notes, which indicate–with one exception–that Mr. Jones presented either "neatly dressed, well-groomed" or in an "appropriate fashion."  However, the ALJ did not discuss this contradiction.  Further, I am also troubled by the ALJ's failure to acknowledge Dr. Antiaris's opinion that Mr. Jones is "markedly" limited in his ability to deal with stress.  Nonetheless, even assuming substantial

---

[9]  The ALJ was mistaken: Dr. Al-Tariq opined that Mr. Jones was *very* (not severely) limited in his ability to maintain personal hygiene and grooming.  R. 416.

evidence does not support the ALJ's determination that Mr. Jones was moderately limited in his ability to adapt and manage himself, that error is harmless because: (1) plaintiff does not proffer evidence demonstrating that Mr. Jones had an "extreme" limitation in his ability to adapt or manage himself; (2) the "Paragraph B" criteria are satisfied if *two* areas of functioning are markedly limited; and (3) as previously discussed, substantial evidence supports the ALJ's determination that Mr. Jones was moderately limited in three (out of four) areas of functioning.

2.  *"Paragraph C" criteria*

A claimant satisfies the requirements of the "Paragraph C" criteria in Listings 12.04, 12.06 and 12.15 if a mental disorder is "serious and persistent" (evidence of "a medically documented history of the existence of the disorder over a period of at least 2 years:) and there is evidence of both:

> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder (see 12.00G2b); and
> 2. Marginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life (see 12.00G2c).

Id., §§ 12.04, 12.06, 12.15.  Here, the ALJ determined that the "Paragraph C" criteria were not met in this case.  R. 15.  That determination is supported by substantial evidence.  The ALJ acknowledged that Mr. Jones's "mental impairments have persisted for more than two years" and that he "was receiving treatment in the form of outpatient therapy, outpatient medication management, and hospitalization."  Id.  However, as noted by the ALJ, "it is clear from the record that the claimant is able to gain steady improvement in his mental health from medication."  Id.

*        *        *

-28-

At bottom, plaintiff fails to establish that Mr. Jones's medical condition or conditions meet all of the specific medical criteria of Listings 12.04, 12.06, 12.11 or 12.15.

D.  Weight Accorded to Dr. Al-Tariq's Opinion

Plaintiff argues that the ALJ erred because she did not accord controlling weight to Dr. Al-Tariq's opinion.  "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion."  Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019). "First, the ALJ must decide whether the opinion is entitled to controlling weight."  Id. The ALJ must give controlling weight to a treating physician's opinion as to the nature and severity of the impairment if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Id. (quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)).  If a treating physician's opinion is contradicted by or inconsistent with other substantial evidence in the record, the ALJ may give that treating source's opinion less weight.  See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

Second, if the ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6);  see also Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).  These "nonexclusive *Burgess* factors [include]:  (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  Estrella, 925 F.3d at 95-96 (quotation marks and citations omitted).  In order to override an opinion from a treating physician, the ALJ must "explicitly consider" the *Burgess*

factors.  Greek, 802 F.3d at 375 (quoting Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (per

curiam)).  "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at

step two is a procedural error."  Estrella, 925 F.3d at 96.  If the ALJ has not otherwise provided

"good reasons" for the weight accorded to a treating physician's opinion, the case must be

remanded unless "a searching review of the record" assures the Court that the ALJ applied "the

substance of the treating physician rule."  Id.[10]

> Here, the ALJ addressed Dr. Al-Tariq's opinion as follows:

> He stated that the claimant is severely limited in interacting appropriately with
> others; in maintaining socially appropriate behavior without exhibiting behavior
> extremes; and appearing able to function in a work setting at a consistent pace.
> Dr. Al-Tariq also indicated that the claimant is very limited in maintaining basic
> standards of personal hygiene and grooming and is moderately limited in making
> simple decisions.  He opined that the claimant is absolutely unable to work in any
> environment for at least 12 months due to extreme PTSD symptoms.  Though Dr.
> Al-Tariq is the claimant's treating physician, the undersigned gives little weight
> to his opinion.  First, a determination of disabled is reserved exclusively for the
> Commissioner.  Dr. Al-Tariq's opinion also does not contain any meaningful
> assessment of the claimant's functional limitations and is inconsistent with the
> claimant's admitted activities of daily living.

R. 18.

> In my view, upon careful review of the record, the ALJ applied the substance of the

treating physician rule and properly articulated her reasons for the weight she gave to Dr. Al-

Tariq's opinion.  *First*, as noted by the ALJ, "a treating physician's statement that the claimant is

disabled cannot itself be determinative."  Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012)

(quoting Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)).  *Second*, Dr. Al-Tariq's opinion

consisted primarily of checked-off boxes, and lacked significant explanation or discussion.  The

---

[10]  Although the SSA revised its rules to eliminate the "treating physician rule," it
remains applicable to claims filed before March 27, 2017.  See, e.g., Salati v. Saul, 415 F. Supp.
3d 433, 447 (S.D.N.Y. 2019).

Second Circuit has upheld consideration of this factor in the context of determining whether "good reasons" supported the ALJ's decision to accord less weight to a treating physician's opinion.  Heaman v. Berryhill, 765 F. App'x 498, 501 (2d Cir. 2019) ("good reasons" included statement that treating physician opinions were "merely checkbox forms that offer little or nothing with regard to clinical findings and diagnostic results").  *Third*, the ALJ's decision included an extensive, detailed discussion of Mr. Jones's treatment history and mental health treatment notes, and examined Dr. Al-Tariq's opinion in the context of discussing additional opinion evidence (from Dr. Gulati, Dr. Antiaris and Dr. Hou (a state agency reviewer)).[11]  Thus, it is clear that the ALJ considered the amount of medical evidence supporting Dr. Al-Tariq's opinion and its consistency with the remaining medical evidence.  Indeed, the court's review of the objective medical evidence in the record reveals that Dr. Al-Tariq's opinion regarding the severity of Mr. Jones's impairments is inconsistent with treatment notes which indicate that Mr. Jones: consistently presented either "neatly dressed, well-groomed" or in an "appropriate fashion"; had mild, intermittent problems with recent and remote memory; had minimally-impaired insight and fair judgment; was consistently open and cooperative; had a mild degree of conceptual disorganization; and routinely exhibited no audio or visual hallucinations.  Further, the opinions of Dr. Antiaris and Dr. Hou were generally consistent with each other and with the

_____

[11]  Dr. Hou opined that Mr. Jones was moderately limited in his ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday/workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. R. 113-14.

-31-

medical record as a whole; on that basis, the ALJ accorded those opinions "great weight."  The ALJ also noted evidence of Mr. Jones's ability to perform ADLs.  "When determining the weight that should be assigned to a treating physician's opinion, the ALJ may also consider: the opinions of other medical experts that conflict with those of the claimant's treating physician; a lack of objective medical evidence supporting the treating physician's opinion; and evidence from the claimant h[im]self that undermines [his] treating physician's opinion about [his] limitations."  Quintana v. Berryhill, No. 18 Civ. 00561, 2019 WL 1254663, at *10 (S.D.N.Y. Mar. 19, 2019) (citations omitted).  *Fourth*, plaintiff argues that the ALJ was required to give more weight to Dr. Al-Tariq's opinion because it was consistent with an opinion from Dr. Helprin and the opinion from LCSW Denman.  However, the ALJ properly ignored those opinions: Dr. Helprin's opinion was referred to in ALJ Rodriguez's earlier decision and is not part of this administrative record; and, as discussed above, the ALJ excluded LCSW Denman's medical source statement.

In sum, the ALJ applied the substance of the treating physician rule and proffered "good reasons" for the weight she accorded Dr. Al-Tariq's opinion.  Accordingly, plaintiff's contention that the ALJ erred by failing to give controlling weight to Dr. Al-Tariq's opinion is meritless.

E.  Evaluating Mr. Jones's Statements and Allegations

Plaintiff argues that the ALJ incorrectly discounted Mr. Jones's testimony about his symptoms and conditions.  Under the statute, when a medically determinable impairment exists, objective medical evidence must be considered in determining whether disability exists (if such evidence is available),  See 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  Further, if a claimant's reported symptoms suggest a greater restriction of function than can be demonstrated by objective evidence alone, consideration is also given to such factors as: (1) the claimant's daily

-32-

activities; (2) the location, duration, frequency and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and adverse side effects of medication; (5) treatment (other than medication) that the claimant receives or had received; (6) any measures a claimant uses to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  See 20 C.F.R. §§ 40.1529(c)(3), 416.929(c)(3).

Here, the ALJ considered Mr. Jones's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR16-3p."  R. 16.  More specifically, the ALJ compared Mr. Jones's allegations of functional limitation "to the evidence in the case record" and evaluated "the extent to which [his] testimony is contradicted or corroborated by other evidence and any other circumstances that tend to shed light upon the limiting effects of [his] symptoms."  R. 20.  Following a detailed examination of plaintiff's mental health treatment history and the opinion evidence, the ALJ concluded that Mr. Jones's "statements concerning the intensity, persistence and limiting effects of these symptoms are found to be inconsistent with the objective evidence in the case record.  Additionally, inconsistencies with other evidence, as discussed above, render the claimant's allegations less persuasive."  Id.  Plaintiff argues that the ALJ's assessment of Mr. Jones's statements and allegations was "impermissibly infected" by the ALJ's allegedly erroneous weighing of Dr. Al-Tariq's opinion and her failure to properly evaluate the Listings.  Dkt. #33, at 35.  However, as discussed above, the ALJ's evaluation of Dr. Al-Tariq's opinion and the Listings is supported by substantial evidence.  At bottom, the ALJ's rationale comports with statutory and regulatory requirements and is supported by substantial evidence.

F.  Challenge to the ALJ's RFC Determination

Plaintiff argues that the ALJ erred in evaluating Mr. Jones's RFC, on the ground that the ALJ's RFC determination "was the product of his [sic] errors in evaluating [1] severe and not severe impairments, (2) medical evidence and Dr. Al-Tariq's opinion, and (3) the consistency of the evidence about his statements and all other evidence."  Dkt. #33, at 36-37.  However, for the reasons discussed above, the ALJ's underlying determinations were not erroneous.  Accordingly, plaintiff's argument is meritless.

G.  Step Five

At the hearing, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with Mr. Jones's age, education and work history, and is able to work at all exertional levels, but limited to working in a low-stress environment (occasional use of judgment, occasional decision-making and occasional changes in the work setting), limited to simple, routine and repetitive tasks, and limited to occasional interactions with supervisors, coworkers and the public.  R. 53.  The vocational expert testified that such a person could perform the jobs of marker, routing clerk and cleaner/housekeeping, and that tens of thousands (or hundreds of thousands) of these jobs existed in the national economy.  R. 53-54.  Based upon this testimony (and considering Mr. Jones's age, education, work history and RFC), the ALJ concluded (at step five) that Mr. Jones was not disabled "under the framework of section 204.00 in the Medical-Vocational Guidelines."  R. 21-22.  See 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 204.00.  Plaintiff contends that the ALJ failed to meet her burden at step five for several reasons, none of which are persuasive.

*First*, plaintiff argues that the hypothetical questions posed to the vocational expert did not reflect the effects of PTSD or include limitations relating to Mr. Jones's ability to add and

subtract and maintain attention.  Dkt. #33, at 37,  This argument is based upon plaintiff's

assertion that the ALJ's assessment of Mr. Jones's RFC was erroneous which, in turn, hinges on

plaintiff's specific challenges (discussed *supra*) to the ALJ's decision.  The Court has rejected

those challenges, for the reasons set forth above.

     *Second*, plaintiff asserts that, because Mr. Jones was 49 years and two months old at the

time of the ALJ's decision, the ALJ was required to use the next older age category (individuals

50 and older) when applying the medical-vocational guidelines.  Dkt. #33, at 37-38.  The

regulations provide for three distinct age categories: (1) "younger person," defined as an

individual between the ages 18 and 49; (2) "person closely approaching advanced age," defined

as an individual between the ages 50 and 54; and (3) "person of advanced age," defined as an

individual 55 years of age and over. 20 C.F.R. § 404.1563(c)-(e).  The regulations also state: "If

you are *within a few days to a few months* of reaching an older age category, and using the older

age category would result in a determination or decision that you are disabled, we will consider

whether to use the older age category after evaluating the overall impact of all the factors of your

case."  20 C.F.R. § 404.1563(b) (emphasis added).  The SSA's Hearings, Appeal and Litigation

Law Manual *209 ("HALLEX") provides further guidance:

> SSA does not have a precise programmatic definition for the phrase "within a few
> days to a few months."  The word "few" should be defined using its ordinary
> meaning, e.g., a small number.  Generally, SSA considers a few days to a few
> months to mean a period not to exceed six months.

HALLEX I–2–2–42., BORDERLINE AGE, 2016 WL 1167001, at *1 (Mar. 25, 2016).  "Most

district courts within the Second Circuit follow the HALLEX and hold that a period of up to six

months is borderline."  Woods v. Colvin, 218 F. Supp.3d 204, 209 (W.D.N.Y. 2016) (citing

cases).  Here, as of the date of the ALJ's decision, Mr; Jones was almost ten months shy of

becoming a "person closely approaching advanced age."  Accordingly, plaintiff's argument is unavailing.

*Finally*, plaintiff argues, somewhat vaguely, that "the testimony relied on by the ALJ may not satisfy the definition of 'region' as defined by 42 U.S.C. [§]423(d)(1)(A), (d)(2)(A)." Dkt. #33, at 38.  That statute defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C.§ 423(d)(2)(A).  However, the regulations make clear that "[w]ork may be considered to exist in the national economy regardless of whether it exists in the immediate area of the claimant's residence, whether there is a specific job vacancy, or whether the claimant would be hired upon applying to the position.  Sanchez v. Berryhill, 336 F. Supp.3d 174, 177 (W.D.N.Y. 2018) (citing 20 C.F.R. § 404.1566(a)(1)-(3)).  Accordingly, at step five, the ALJ properly relied upon testimony from the vocational expert regarding the availability of other jobs in the national economy that Mr. Jones could perform.

## V.  CONCLUSION

For the reasons set forth above, the Commissioner's motion is **GRANTED** and plaintiff's motion is **DENIED**.

The Clerk of the Court is directed to terminate the pending motions (Dkt. #19, #23) and close this case.

Dated: March  30 , 2021                                SO ORDERED.
       White Plains, New York

                                                       _____
                                                       PAUL E. DAVISON, U.S.M.J.